OPINION
{¶ 1} Appellant, Joseph P. Ross, appeals from a judgment of the Ashtabula County Court of Common Pleas after a trial by jury whereby appellant was convicted on one count of murder and one count of felony murder.
 {¶ 2} On April 16, 2002, appellant and his nephew, George Jiminez ("Jiminez"), spent their afternoon chasing beer with shots of Fire Water and Jack Daniels. The two individuals resided in the same apartment building on Station Avenue in the City of Ashtabula. Jiminez, who was seventeen years old at the time, lived in an apartment with his mother and brother, while appellant resided in a separate apartment with his parents, his wife, and their children. At approximately 4:30 p.m., appellant and Jiminez ran out of beer. The two walked to a nearby BP station, purchased more beer, and continued drinking. As evening descended, Jiminez expressed an interest in smoking a "Black and Mild" cigar. At approximately 9:00 p.m. the two walked to a local carry-out store to purchase the cigar.
 {¶ 3} While they were walking, Jiminez encountered one Shaun Baker walking in the opposite direction. Jiminez and Baker physically bumped shoulders as they passed. When Baker advised Jiminez to "Watch it[,]" Jiminez retorted: "Fuck you[,]" and observed, "[y]ou don't own this road." Agitated and intoxicated, Jiminez then discarded his shirt and offered: "We could do it here." According to Jiminez, Baker glanced at both him and appellant, then "ran down the road."
 {¶ 4} After the encounter, appellant and Jiminez decided to return to their apartment building. On the way, a group of approximately seven people approached and began to yell at them. Appellant and Jiminez exchanged imprecations with the group and continued on their way home. At this point, Jiminez testified, both he and appellant were angry.
 {¶ 5} After returning to the apartment building, appellant entered his apartment. Jiminez testified appellant wanted to retrieve a gun, but was discouraged by his father. Several minutes later, appellant emerged from the building with at least three knives. Jiminez testified appellant handed him two knives and kept a sheathed Bowie knife. Appellant and Jiminez left the apartment and began walking back to the place where they had the original encounter. Jiminez testified that, at this point, he and appellant "were looking for a fight."
 {¶ 6} As they neared their destination, appellant and Jiminez began shouting at a group of black individuals who had congregated on the street ahead of them. Jiminez testified:
 {¶ 7} "I said, `Fuck you, niggers. Come on.' And my uncle said it, too. My uncle said it. And then, you know, the crowd of black people down the road were coming towards us, and we, you know, cussed back and forth. And then they came up to us, and that's when I — I think I pulled — I pulled out the knives. And a bottle, a forty bottle come flying at my face, I kind of like hit it. And then a guy — I don't know who it was at that point — come at me swinging, and I kind of like backed up and I was like in the road. * * *
 {¶ 8} "* * *
 {¶ 9} "I was swinging at his face [with the knives], and then he stopped, stopped swinging at me. And I got hit in the side with a stick and then I, like, fell on my side and then I ran. I don't know if it was in front of my uncle or right behind my uncle, but I ran. * * *."
 {¶ 10} Joseph Elliot witnessed the fracas from his front yard. Elliot testified, at approximately 9:30 p.m. on April 16, 2002, he saw two Caucasian males walk past his fence and begin yelling obscenities at a group of five black males. Elliot stated the shorter of the two individuals was heavy set, with dark hair, and appeared to be a juvenile; according to Elliot, the taller individual had light, shoulder length hair and appeared to be in his thirties. Elliot ultimately identified appellant as the older of the two males.
 {¶ 11} According to Elliot the groups met and the smaller of the two Caucasians, i.e., Jiminez, "started swinging his knife around." At that point, Elliot testified, Jiminez was hit in the head by a thrown beer bottle. After being struck, Elliot stated that Jiminez sliced one of the black men on the arm. According to Elliot's testimony, Troy Montgomery ("Montgomery") then "came up with a stick and was trying to swing at [Jiminez] because he couldn't get close to him[,]" then Montgomery "cracked [Jiminez] in his arms and ribs." Jiminez exclaimed "`Oh shit,' turned around," and approached Elliot's fence.
 {¶ 12} According to Elliot, Montgomery then attempted to "get the bigger guy and that's when he got stabbed." Elliot testified that Montgomery attempted to "sneak up" on appellant and appellant turned and thrust the blade of the Bowie knife into Montgomery's chest. After appellant pulled back the knife, Montgomery slumped to the ground.
 {¶ 13} At that point, Elliot testified:
 {¶ 14} "The bigger guy kind of backed up towards the fence to where the little guy was, and people started coming towards him. I think there was a lady with a stick that was coming up towards him. She picked up a stick that Troy had in his hands. And his buddy stood there, the little guy, with a knife and confronted the girl with the stick, and the bigger guy was yelling, `Let's go. We need to get out of here.' Then, [the] little guy started waving his knives around again. And then she started poking at him like this (indicating), and he took the knife, threw it really hard. It hit the cement, flew that way, and about that point in time [I] heard sirens."
 {¶ 15} Montgomery was later pronounced dead from the stab wound.
 {¶ 16} Dannette Elliot, Joseph Elliot's wife, testified that around 9:00 p.m. or 9:15 p.m. on the night of April 16, 2002, she saw "two guys around [her] fence that [she] hadn't seen before * * *." Mrs. Elliot stated the two individuals, later identified as appellant and Jiminez were "yelling obscenities to people down the road * * *." Mrs. Elliot described their tone as "agitated." At this point, she observed a "group of black gentlemen" approaching and the two individuals situated near her fence "start charging at them." She testified she did not hear the black men yelling and when the two groups confronted one another, Mrs. Elliot testified that the one of the black men put his hands up and said "`[h]ey, we don't need the trouble.'"
 {¶ 17} Mrs. Elliot observed Jiminez waive his knives in "a Ninja fashion, and it just escalated at that point." According to Mrs. Elliot, Jiminez was hit in the head with a bottle; he was then hit with a stick in the forearm and ribs. Mrs. Elliot testified appellant "slashed" one of the black men and then turn around and "slash * * * a big knife into Troy." Mrs. Elliot testified that as appellant "was plunging the knife into Troy," she heard him say "`[h]ere you go, you fucking nigger.'" At that point, Mrs. Elliot said she saw "Troy melt * * * his body went limp." Mrs. Elliot was positive it was appellant that stabbed Montgomery.
 {¶ 18} Jiminez stated that neither he nor appellant called the police upon returning home. However, the next day, appellant confided in Jiminez: "I think I killed someone." Appellant and Jiminez were subsequently arrested.
 {¶ 19} On June 7, 2002, appellant was indicted on one count of murder, in violation of R.C. 2903.02(A) ("Count One"); aggravated murder, in violation of R.C. 2903.01 ("Count Two"); and felony murder, in violation of R.C. 2903.02(B) ("Count Three"). Upon arraignment, appellant pleaded not guilty to these charges.
 {¶ 20} A jury trial was conducted on July 8, 2003 and July 15, 2003. The jury returned a verdict of guilty on Count One and Count Three; appellant was found not guilty on Count Two. On July 23, 2003, the trial court merged the two convictions and sentenced appellant to a prison term of fifteen years to life. Appellant now appeals and raises two assignments of error:
 {¶ 21} "[1.] The appellant was deprived of the effective assistance of counsel guaranteed him by the Sixth andFourteenth Amendments to the United States Constitution and Article I, Section 10 of the Ohio Constitution.
 {¶ 22} "[2.] The Ashtabula County Court of Common Pleas erred to the prejudice of appellant when it accepted the jury's verdicts of guilty to Counts One and Three of the indictment as the jury's verdicts on those counts were against the manifest weight of the evidence."
 {¶ 23} In his first assignment of error, appellant contends his trial counsel's use of the defense of self-defense was "patently absurd and legally unsustainable;" accordingly, appellant entreats this court to hold his counsel's assistance constitutionally ineffective.
 {¶ 24} To sustain a claim of ineffective assistance of counsel, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness; and (2) there is a reasonable probability that, but for counsel's errors, the outcome of the proceeding would have been different when considered in relation to the totality of the evidence before the court. Strickland v. Washington (1984), 466 U.S. 668.
 {¶ 25} With regard to the first prong, counsel is entitled to a strong presumption that his or her conduct falls within the vast range of reasonable professional assistance. Appellant must therefore overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." Id. at 689. Strategic and tactical decisions fall squarely within the scope of professionally reasonable judgment. Id. at 699.
 {¶ 26} With respect to the second prong, appellant must demonstrate he was prejudiced by "a probability sufficient to undermine confidence in the outcome." Id. at 694. The inquiry is whether counsel's errors were so serious as to deprive appellant of a proceeding whose results are reliable, i.e., "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Id. at 686.
 {¶ 27} Appellant's first assigned error suggests that defense counsel's entire theory of defense was self-defense. We believe this is a misrepresentation of defense counsel's strategy: While defense counsel did employ a theory of self-defense, he also argued the state failed to put forth adequate, persuasive evidence that appellant actually killed Montgomery. That is, defense counsel argued that the state did not offer consistent, compelling evidence as to appellant's identity. However, if the jury chose to believe the state's evidence in this respect, there was ample evidence of self-defense. These arguments were clearly set forth in closing argument and supported with references evidence adduced at trial.
 {¶ 28} Moreover, the jury also was instructed on the elements of the inferior offense of voluntary manslaughter, i.e., killing another in the heat of sudden passion of a sudden fit of rage.[1] Such an instruction is appropriate where a defendant produces sufficient evidence of the mitigating circumstance entitling him to such an instruction. State v.Wilkins (1980), 64 Ohio St.2d 382, 388. Defense counsel presented sufficient evidence of mitigating circumstances to earn the voluntary manslaughter instruction; such an effort could be construed as an additional defense to the charges of murder, aggravated murder, and felony murder. In our view, the defenses just enumerated, while difficult to accept given the state of the evidence, are the only ostensible defenses available under the circumstances. In this respect, we believe trial counsel's performance in no way fell below a standard of reasonable professional representation.
 {¶ 29} Further, even had counsel only employed the defense of self-defense, we do not think such would be adequate to meet the arduous requirements of Strickland. If the jury believed Jiminez was the sole instigator of the affray and appellant was a mere bystander to his nephew's aggressive conduct, it is conceivable the jury could find appellant was acting in self-defense when Montgomery was stabbed: The evidence indicated that appellant and Jiminez were significantly outnumbered. The evidence also established that Jiminez was hit in the head with a bottle after which he brandished two knives. Further, Joseph Elliot testified, during the initial confrontation between the groups, appellant remained on the side, as though he was "back up" to Jiminez. Witnesses also indicated that immediately prior to the stabbing, Montgomery had struck Jiminez in the arm and ribs with a stick and subsequently tried to "sneak up on" appellant. Under this construction, counsel's employment of the defense of self-defense, while tenuous, was not unreasonable given the evidence adduced at trial. Accordingly, appellant fails to meet the first prong of Strickland.
 {¶ 30} Assuming arguendo appellant could demonstrate his trial counsel's performance was objectively deficient, he still fails to demonstrate how he was prejudiced. In his brief, appellant focuses solely upon the first prong of Strickland in concluding trial counsel rendered ineffective assistance. It is patent that appellant must establish both prongs of Strickland
to assert a colorable claim for ineffective assistance of counsel. See, e.g., State v. Pasqualone (Mar. 31, 1999), 11th Dist. No. 97-A-0034, 1999 Ohio App. LEXIS 1429, at 14. By failing to elucidate how he was prejudiced, appellant's ineffective assistance argument is per se insufficient.
 {¶ 31} Appellant's first assignment of error is without merit.
 {¶ 32} In his second assignment of error, appellant argues his convictions are against the evidential weight. When reviewing a challenge to a criminal conviction based upon the weight of the evidence, an appellate court reviews:
 {¶ 33} "`the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" State v. Newton (June 27, 1997), 11th Dist. No. 96-L-058, 1997 Ohio App. LEXIS 2802 at 14, citing, State v.Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 34} Appellant's argument focuses upon various inconsistencies in the testimony of eyewitnesses. In particular, appellant notes that Mr. and Mrs. Elliot testified appellant stabbed Montgomery with his right hand. However, defense witness Lucas Williams claimed the knife was thrown. Dr. Joseph Felo of the Cuyahoga County Coroner's Office, testified that the knife pierced the victim's breastplate. Dr. Felo indicated the amount of force required to inflict this kind of injury is consistent with a stabbing or thrusting motion, not throwing. Appellant asserts that the differences in the foregoing testimony demonstrate the state could not prove its case beyond a reasonable doubt. Accordingly, appellant concludes the jury clearly lost its way and the verdict is against the weight of the evidence. We disagree.
 {¶ 35} While minor inconsistencies exist in the evidence, each eyewitness was consistent with respect to one important fact, viz., that appellant was the party who stabbed Montgomery. Mr. and Mrs. Elliot testified to this fact and Lucas Williams, a defense witness, also testified to this fact. After a careful review of the evidence, we believe the verdict is supported by the manifest weight of the evidence. The jury did not err in convicting appellant of murder and felony murder. Therefore, appellant's second assignment of error is without merit.
 {¶ 36} For the above reasons, appellant's two assignments of error are overruled and the judgment of the Ashtabula Court of Common Pleas is hereby affirmed.
O'Neill, J., and O'Toole, J., concur.
[1] Voluntary manslaughter has been defined as an inferior degree of murder. State v. Rhodes (1992), 63 Ohio St.3d 613,617. "[A]n offense is an `inferior degree' of the indicted offense where its elements are identical to or contained within the indicted offense, except for one or more additional mitigating elements." State v. Deem (1988), 40 Ohio St.3d 205, paragraph two of the syllabus.